IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL GIPSON, ) | Case No. 2:07-cv-00260-MSB |
| Petitioner, ) | **ORDER** |
| vs. ) | |
| D. K. SISTO, Warden, et al., ) | |
| Respondents. ) | |

This case was reassigned to the undersigned judge. Dkt. #18. Petitioner Michael Gipson, a California state prisoner, has filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2554. Dkt. #1. Gipson claims that the California Board of Parole Hearings (Board) violated his federal due process rights in denying him parole in 2005. For the reasons stated below, his petition is **DENIED.**

**I.   FACTUAL BACKGROUND**[1]

In October 1987, Gipson, then 43, was residing with his girlfriend, Barbara Tolbert, in Richmond, California. Dkt. #6, Exh. A at 1, 3-4, 9. Tolbert's son, 22-year-old Omar Tolbert, had also been living with them, but Tolbert demanded he move out in September 1987 because "he was using drugs and was acting strange." *Id.* at 4. Omar had attacked

---

[1] As the state court opinion contains no factual summary, the foregoing facts are taken from the Probation Officer's Report and Recommendation. Dkt. #6, Exh. A.

1  Gipson in early September, striking him in the head and giving him a concussion. *Id.* at 4-5,
2  7-8. Gipson had subsequently begun carrying a gun. *Id.* at 9.

3  On October 4, Gipson, who had a history of alcohol abuse, had drunk two bottles of
4  wine and was at home at the apartment he shared with Tolbert. *Id.* at 9, 11. Just before
5  midnight, Omar and his girlfriend, Tamara Mack, stopped by to pick up some of Omar's
6  clothes. *Id.* at 5. According to Mack, Omar knocked on the door and Gipson opened it
7  immediately, a small gun in his hand. Gipson pointed the gun at Omar and pulled the trigger,
8  but nothing happened. Gipson then fired approximately three shots at Omar, who fell to the
9  ground. *Id.* After going to the bedroom and reloading his gun, Gipson returned to where
10 Omar lay calling for help and shot him several more times from about three feet away. *Id.*
11 at 6. Omar died of his wounds shortly afterward. *Id.* at 4.

12 Gipson went inside the apartment and told Tolbert he had shot Omar and that he had
13 to leave. *Id.* Police found him walking nearby. When ordered to halt, he said, "It's me, it's
14 me, you caught me." *Id.*

15 A jury convicted Gipson of second-degree murder, Cal. Pen. Code § 187, with
16 personal use of a firearm, *id.* § 12022.5, on June 24, 1988. Dkt. #6, Exh. B. He was
17 sentenced to seventeen years to life in prison. *Id.* Gipson's minimum eligible parole date
18 was December 26, 1998. Dkt. #6, Exh. C at 1.

19 **II.    PROCEDURAL HISTORY**

20 On October 21, 2005, the Board of Parole Hearings (Board) denied Gipson parole for
21 the fifth time. It concluded that he was "not suitable for parole and would pose an
22 unreasonable risk of danger to society or a threat to public safety if released from prison."
23 Dkt. #6, Exh. O at 60. The Board cited as reasons for its decision (1) the "cruel and callous"
24 character of the commitment offense, (2) Gipson's "escalating pattern of criminal conduct"
25 prior to the commitment offense, (3) his "unstable social history," (4) the "limited manner"
26 in which he had "programmed" while incarcerated, and (5) a 2003 psychological report "not
27 totally supportive of release." *Id.* at 60, 66-67. The Board found that Gipson "needs therapy
28 in order to face, discuss, understand and cope with stress in a nondestructive manner." *Id.*

1  at 68. It commended him for attending a stress management workshop and "continuing to
2  be discipline-free," but it was concerned that he had not participated in Alcoholics
3  Anonymous since early 2004. In response to Gipson's testimony in the hearing that he had
4  not drunk alcohol in nineteen years and that he practiced the AA steps on his own because
5  he considered AA a "way of life," *id.* at 49, the Board recommended that Gipson provide
6  evidence of his progress by "do[ing] a self-study." *Id.* at 68.

7  Gipson filed a pro se petition for habeas corpus in the Contra Costa County Superior
8  Court. Dkt. #16, Exh. 1(a). He contended that (1) there was no evidence in the record to
9  support the denial of parole, (2) the Board did not individually consider all factors relevant
10 to parole decisions, and (3) the hearing was not timely under Cal. Penal Code § 3041.5(b),
11 all in violation of his due process rights under the state and federal constitutions.

12 The Superior Court denied Gipson's petition. Dkt. #16, Exh. 2. It found "some
13 evidence" of future dangerousness based on the commitment offense, Gipson's post-
14 conviction behavior, and his previous record and social history. *Id.* at 3-6. The court also
15 found that the Board had violated the mandatory time frame for holding a successive parole
16 hearing, and requested that the California Attorney General file an informal response to the
17 petition on the issue of whether scheduling an annual parole hearing within twelve months
18 of the previous hearing was mandatory under California law. *Id.* at 7. After considering the
19 Attorney General's response and Gipson's reply, the court found that the statutory
20 requirement that parole hearings be held annually was directory rather than mandatory, and
21 thus the Board's decision was not invalid due to the delay. Dkt. #16, Exh. 5. Moreover, the
22 court held that Gipson's due process rights were not violated because he was not prejudiced
23 by the delay. *Id.*

24 Gipson then raised his claims in two petitions to the California Court of Appeal. Dkt.
25 #16, Exhs. 6-8. The court summarily denied the petitions. He subsequently raised the same
26 claims in two petitions to the California Supreme Court, which summarily denied both. Dkt.
27 #16, Exhs. 9-12.

28

Gipson filed a federal petition for writ of habeas corpus in the U.S. District Court for the Eastern District of California on February 9, 2007. Dkt. #1. Magistrate Judge Dale A. Drozd ordered the respondent to file an answer to the petition; the answer was filed on September 9, 2008. Dkt. #16. Gipson filed a traverse. Dkt. #17. This case was then reassigned to the undersigned judge. Dkt. #18. Gipson has not been paroled, but he has received three subsequent parole hearings, all of which resulted in a denial of parole. Dkt. # 22, 2.

## III. STANDARD OF REVIEW

Because Gipson filed his habeas petition after April 24, 1996, it is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132110 Stat. 1214.

Under AEDPA, when a state court has ruled on the merits of a petitioner's claim, a federal court may only grant habeas relief if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Because the opinion of the Superior Court was the only reasoned state decision, this Court looks to the grounds it articulated to determine whether Gipson's claims warrant federal habeas relief. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991).

## IV. DISCUSSION

Gipson presents three major arguments in his habeas petition, which the State recognizes are exhausted to the extent they are considered here. *See* Dkt. #16, 3-4. The State's explicit concession means this Court need not consider exhaustion. *See* 28 U.S.C. § 2254(b)(3). Gipson's claims are as follows: (1) the Board violated his due process rights by making a decision that was not supported by some evidence in the record; (2) the Board failed to consider the use of special conditions of parole to ensure his safe release into the

- 4 -

1  community; and (3) the Board's failure to hold a hearing prior to his presumptive release
2  date violated due process.  Dkt. #1, 5, 14.

3  **A.  Board Decision Based on "Some Evidence"**

4  Gipson's claims that the Board's decision was not supported by "some evidence."
5  *Id.* at 5-13.  His claim raises issues under *Hayward v. Marshall*, which held that due process
6  challenges to California courts' application of the "some evidence" requirement for parole
7  denial are cognizable on federal habeas review.  603 F.3d 546, 561-64 (9th Cir. 2010) (en
8  banc). Under *Hayward*, federal courts reviewing habeas petitions must determine "whether
9  the California judicial decision rejecting parole was an 'unreasonable application' of the
10 California 'some evidence' requirement, or was 'based on an unreasonable determination
11 of the facts in light of the evidence.'"  *Pearson v. Muntz*, 606 F.3d 606, 608 (9th Cir. 2010)
12 (quoting *Hayward*, 603 F.3d at 563).  In making such a determination, this Court is bound
13 by the California courts' interpretation of the "some evidence" requirement to the extent that
14 it is a question of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (federal habeas
15 courts may not reexamine state court's determinations on state-law questions).

16 In California, "the paramount consideration for . . . the Board . . . under the governing
17 statutes is whether the inmate currently poses a threat to public safety and thus may not be
18 released on parole." *In re Lawrence*, 190 P.3d 535, 552 (Cal. 2008).  Thus "the facts relied
19 upon by the Board [must] support the ultimate decision that the inmate remains a threat to
20 public safety."  *Id.* at 554.  In assessing that "ultimate decision," the "relevant inquiry is
21 whether some evidence supports the *decision* of the Board . . . that the inmate constitutes
22 a current threat to public safety, and not merely whether some evidence confirms the
23 existence of certain factual findings."  *Id.* at 553; *see also Hayward*, 603 F.3d at 562
24 ("'[S]ome evidence' of future dangerousness is indeed a state *sine qua non* for denial of
25 parole.").

26 The "some evidence" requirement is qualitative, not just quantitative.  A reviewing
27 court must examine whether the Board's decision to deny parole is "supported by some
28 *evidence*, not merely by a hunch or intuition."  *Lawrence,* 190 P.3d at 554.  Courts must

therefore determine "whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record." *Id.* at 560 (emphasis in original). In applying this standard, the Court inquires into the logical nexus between the evidence the Board has identified and the conclusion that the defendant is a danger to the community. It does not engage in determinations of credibility or weighing of the overall balance of evidence in the record because "[r]esolution of any conflicts in the evidence and the weight to be given the evidence are within the authority of the Board." *Id.* at 548 (citing *In re Rosenkrantz*, 59 P.3d 174, 204 (Cal. 2002)).

### 1. The Commitment Offense

The Board relied in part on the nature of the commitment offense. It found that the crime was "a dispassionate execution style killing" with "elements of premeditation" in which Gipson shot the victim "three times[,] reloaded and shot a couple of more times . . . once the victim was clearly disabled and on the ground." Dkt. #1, Exh. O at 43. The Board concluded that Gipson had a "relatively trivial motive" because the fight between Gipson and the victim occurred "about a month earlier," and there was no indication the victim presented a threat when he came to the door. *Id.* The Board also found that Gipson showed "callous disregard for the suffering of the victim" because he left the scene instead of "stick[ing] around to make sure there was any assistance provided," he "declined to . . . withdraw from the crime" at several opportunities, and it "would not be too far of a stretch to say that [Gipson put the victim's girlfriend] in danger as well." *Id.* at 43-44. The state court concluded that the Board had reasonably applied the "some evidence" standard because its findings showed that the murder was "committed in a manner that was aggravated beyond the minimum elements of the offense." *Id.*, Exh. 2, 5 (citing *In re Dannenberg*, 104 P.3d 783, 803 n.16 (Cal. 2005)).

### a. Dispassionate and Calculated Manner

The Board may find evidence of future dangerousness where "[t]he offense was carried out in a dispassionate and calculated manner." Cal. Code Regs., tit. 15 § 2402(c)(1). A commitment offense may be characterized as dispassionate where it was "not influenced

by strong feeling or especially: not affected by personal or emotional involvement." *In re Moses*, 182 Cal. App. 4th 1279, 1302 (2010) (internal quotations omitted). So where there is uncontradicted evidence that the defendant was "angry or distraught," a determination that a killing was "dispassionate and calculated" is unreasonable even where there is some evidence of premeditation. *In re Weider*, 145 Cal. App. 4th 570, 588 (2006); *see also In re Scott*, 133 Cal. App. 4th 573, 596-97 (2005); *In re Gray*, 151 Cal. App. 4th 379, 407 (2007). Similarly, when "the record indicates that [the inmate's] 'copious' consumption of alcohol played a significant role in his actions," it will "undermin[e] the [Board's] characterization of [the inmate] as acting in a 'calculated and dispassionate manner.'" *Moses*, 182 Cal. App. 4th at 1302.

According to Gipson, he committed his offense because he was drunk and afraid of the victim based on their past history. Dkt. # 1, Exh. O at 25. The Board never contradicts this evidence. Instead, it points to the fact that Gipson shot the victim "at pointblank [sic] range," *id.* at 60, and that he reloaded before shooting the prone victim several more times to create "elements of premeditation." *Id.* at 43. Neither of these points speaks to whether Gipson was "not influenced by strong feeling or especially not affected by personal involvement" while he committed the offense. *In re Moses*, 182 Cal. App. 4th at 1302. While the "some evidence" standard is highly deferential, it still requires that the conclusion "be supported by some *evidence*, not merely by a hunch or intuition." *Lawrence*, 190 P.3d at 554. Here, without any proof indicating that Gipson took action in cold blood, the Board has no evidence to support its conclusion.

### b. Exceptionally Callous Disregard for Human Suffering

The Board may find evidence of future dangerousness where "[t]he offense was carried out in a manner that demonstrates exceptionally callous disregard for human suffering." Cal. Code Regs., tit. 15 § 2402(c)(1)(D). To demonstrate such callousness or disregard under California law, the "violence or viciousness of the inmate's crime must be more than *minimally necessary to convict him* of the offense for which he is confined." *Dannenberg*, 104 P.3d at 802 (citing *Rosenkrantz*, 59 P.3d at 223). Upon finding such

1  circumstances, the Board may deem an inmate's offense "particularly egregious" and
2  consider it evidence of an "exceptionally callous disregard for human suffering" that makes
3  the inmate a continuing danger to the community. *Id.* at 803.

4  The Board presents no evidence that Gipson acted with any greater "violence or
5  viciousness" than is minimally required for second-degree murder. The Board's two major
6  sources of evidence for its conclusion are the fact that Gipson could have stopped firing
7  after the first shots, Dk. #1, Exh. O at 44, and that the blood trail suggested that the victim
8  crawled several feet. Dkt. #2 at 4. Neither of these indicates anything about whether
9  Gipson acted viciously. The fact that Gipson could have stopped firing before the victim
10 died cannot be evidence that he committed an especially heinous offense. *See In re
11 Calderon*,184 Cal. App. 4th 670, 686 (2010) ("[A]ll persons convicted of second degree
12 murder may be said to have 'had the opportunity to avoid the life offense' and viciously
13 declined to take it."); *In re Smith*, 114 Cal. App. 4th at 366-67. And the trail of blood only
14 shows that some time passed between when Gipson's first shot and the fatal shot. It is
15 evidence that he did not succeed in killing the victim with his first shots, but does not speak
16 in any way to the question of whether he intended to "gratuitously or unnecessarily prolong[
17 the victim's] pain and suffering." *Smith*, 114 Cal. App. 4th at 367.

18 The Board also took issue with the fact that Gipson left after telling the victim's
19 mother to call 911 and did not "stick around to make sure there was any assistance
20 provided." Dkt. #1, Exh. O at 43. If anything, Gipson's actions are evidence that he had
21 some level of concern for the victim's suffering, not an exceptionally callous disregard for
22 it. The Board finally pointed to the presence of the victim's girlfriend at the scene,
23 reasoning "that [it] would not be too far a stretch to say that she was in danger as well."
24 Dkt. #1, Exh. O at 44. But it cited no evidence that Gipson intended to put anyone other
25 than the victim in danger. Under California law, simply putting other individuals in danger
26 without doing so in a "calculated fashion," even putting a large number of citizens at risk
27 by driving a car at high speeds while under the influence of PCP, does not constitute an
28

1   "'*exceptionally* callous disregard for human suffering.'" *In re Juarez*, 182 Cal. App. 4th
2   1316, 1342-43 (2010) (quoting *In re Smith*, 114 Cal. App. 4th at 366).

### c. Inexplicable or Very Trivial Motive

The Board may find evidence of future dangerousness where "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Cal. Code Regs., tit. 15 § 2402(c)(1)(E). To be trivial under California law, "the motive must be materially less significant (or more 'trivial') than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily presented." *Scott I*, 119 Cal. App. 4th at 893.

The Board found that Gipson's motive was "relatively trivial . . . given the consequences in that the fight . . . occurred about a month earlier," and there "was no indication of a present threat when [the victim] arrived at the door on this particular occasion." Dkt. # 1, Exh. O at 43. However, there was no evidence before the Board that Gipson's motive was "materially less significant . . . than those which conventionally drive people to commit the offense in question." *Scott 1*, 119 Cal. App. 4th at 893. The evidence the Board points to only shows that Gipson's motive was unreasonable given the circumstances of the offense, not that his motive was unreasonable compared to the motives for other second-degree murders. In fact, the only evidence about what Gipson's motive was came from his own testimony that he was drunk and acting out of fear of the victim. Dkt. #1, Exh. O at 43-44. California law requires that the motive be truly trivial in comparison to other crimes, such as currying favor with a member of a stolen car ring, *In re Loresch*, 183 Cal. App. 4th 150, 160 (2010), frustration over a sexual relationship with a teenager, *Lowe*, 130 Cal. App. 4th at 1428, or "financial gain." *Calderon*, 184 Cal. App. 4th at 686. There is no evidence that Gipson acted out of a similar motive. Thus, there was not "some evidence" of Gipson's future dangerousness based on the motive for his offense.

### 2. Previous Record and Social History

The Board may also find evidence of future dangerousness based on an inmate's "unstable social history" as demonstrated through a "history of unstable or tumultuous

1    relationships with others." Cal. Code Regs., tit. 15 § 2402(c)(3). That unstable history is
2    counterbalanced by any "stable social history" based on findings that the inmate
3    "experienced reasonably stable relationships with others." Cal. Code Regs., tit. 15 §
4    2402(d)(2). Because "an inmate's unstable social history, like his commitment offense, is
5    an 'immutable' fact," it is "thus insufficient by itself to prove unsuitability." *In re
6    Shippman*, 185 Cal. App. 4th 446, 458 (2010). So, as with other "subsidiary findings," the
7    Board cannot simply produce evidence that Gipson has had an unstable social history, but
8    must instead tie its findings about Gipson's social history to "the ultimate question of parole
9    suitability[,] whether the inmate poses a threat to public safety." *Pirtle*, 2010 WL 2732888,
10   at *5.

11   The state court admitted it was "troubled by the lack of evidence to support a finding
12   that [Gipson] had an unstable social history," but felt that it was "nevertheless constrained
13   to find that there was some evidence to support the BPH's findings." Dkt. #16, Exh. 2 at
14   6. That evidence consisted of the fact Gipson was "involved in an ongoing disagreement
15   with the victim that culminated in murder," *id.*, "was married at an early age and went
16   through several wives," Dkt. #1, Exh. O at 45, the Board's claim Gipson had an "escalating
17   pattern of criminal conduct which includes four driving under the influence arrests and/or
18   convictions, battery of a police officer and carrying a concealed firearm," *id.* at 66, and the
19   Board's estimation Gipson "failed to profit from previous grants of probation." *Id.* at 45.
20   Of these, only Gipson's failure to "profit from previous grants of probation" constitutes
21   some evidence of future dangerousness.

22   The Board never explains how Gipson's previous social relationships related to his
23   future dangerousness. The Board did not find that Gipson's previous marriages ended due
24   to any violent or dangerous behavior on Gipson's part. Dkt. #1, Exh. O at 45. Thus the fact
25   he "married at an early age and went through several wives," *id.*, says nothing about whether
26   Gipson would be a danger if released. His "tumultuous relationship" with the victim
27   appears to be more relevant to the dangerousness inquiry. However, a single "tumultuous
28   relationship" cannot constitute "some evidence" of future dangerousness several decades

1 later. *Pirtle* 2010 WL 2732888, at *6. And because the Board did not explain how 2 Gipson's history with the victim made him a present danger, it did not establish the required 3 "rational nexus between [the subsidiary] factor[] and the necessary basis for the ultimate 4 decision–the determination of current dangerousness. *Lawrence*, 190 P.3d at 552.

5 While the Board claimed Gipson had an "escalating pattern of criminal conduct," it 6 never presented any evidence that Gipson's criminal history was in fact "escalating." Dkt. 7 #1, Exh. O at 66. To constitute an "escalating pattern of conduct," there must be a pattern 8 of progressively more serious crimes, such as "assault, then assault with a deadly weapon, 9 and then murder." *Moses*, 182 Cal. App. 4th at 1312. Here, there is no such pattern. The 10 order of Gipson's offenses runs as follows: battery on a peace officer ('74), DUI ('78), 11 brandishing a deadly weapon ('80), unlawful carrying of a concealed firearm ('81), DUI 12 ('81), DUI ('85), DUI ('87). Dkt. #1, Exh. O at 18-20. This record does not demonstrate 13 the escalation in seriousness required. If anything, Gipson's record shows a *declining* 14 pattern because he moves from the violent crime of battery to the nonviolent crime of 15 driving under the influence. Thus there is not even support for the "subsidiary finding[]" 16 that Gipson had an escalating pattern of criminal conduct, let alone support for the "ultimate 17 question of . . . whether the inmate [currently] poses a threat to public safety." *Pirtle*, 2010 18 WL 2732888, at *5.

19 However, the Board did present evidence of future dangerousness when it found that 20 Gipson "failed to profit from previous grants of probation." Dkt. #1, Exh. O at 45. Gipson 21 was convicted of carrying a concealed firearm while on probation for brandishing a deadly 22 weapon. *Id.* at 20. Given that Gipson's commitment offense also involved a firearm, his 23 failure to profit from probation on a gun offense by committing a gun offense demonstrates 24 a pattern of committing firearm crimes with "very substantial disregard for the law." *Id.* at 25 45. Moreover, while on probation for carrying a concealed firearm, he was convicted of 26 DUI. *Id.* at 20. The fact that he could not control his drinking while on probation further 27 validated the Board's finding that his "alcohol abuse problem" made him a danger to the 28 community. *Id.* at 45.

### 3. Gipson's Institutional Post-Conviction Behavior

Here, the state court found that the Board had "some evidence" to support its conclusion that Gipson had "failed to sufficiently participate in beneficial self-help and therapy programs," principally Alcoholics Anonymous, and thus remained a danger to the community. Dkt. #16, Exh. 2, 5. Alcohol played a part in several of Gipson's previous convictions, including his commitment offense, a fact he acknowledged. Dkt. #1, Exh. O at 25. Of the four psychological evaluations in the record, two identified alcohol as a risk factor in Gipson's release and three recommended continued participation in a treatment program. Dkt. # 16, Exh. 9(a) at Exh. D; Dkt. #1, Exhs. L-N. The most recent psychological evaluation, which the Board relied on in drawing its conclusions, reads in part:

> He recognizes that all his problems with the law are alcohol related. There is no question that alcohol is a major risk factor with this inmate. Unfortunately, he will have easy access to alcohol in the community. If he continues with his abstinence and is actively involved in a treatment program for his alcoholism, the risk of future violence is low. If he resumes drinking, in view of his compromised blood pressure and circulatory problems, the risk is high because of the impact of these factors on his intellectual functioning.

*Id.* at Exh. N, 4. In light of this evaluation, the Board took issue with Gipson's sporadic participation in AA, noting that he had attended intermittently in the preceding years and not at all in 2005. Dkt. #1, Exh. O at 46.

Gipson explained that he did not attend meetings because he considered AA to be "a way of life," *id.* at 37, that was based on "working the steps" in your daily life rather than going to meetings that "don't help you stop drinking" themselves. *Id.* at 48. As concrete support for his claim, he pointed to the fact that he had never been caught with alcohol in his nineteen years in prison, *id.* at 49, and four years prior to the hearing had gone from smoking two packs of cigarettes a day to quitting cold turkey. *Id.* at 38. Because alcohol was "a factor" in Gipson's commitment offense, and the risk to the public would be "high if [he] resum[ed] drinking," *id.* at 46, the Board concluded that it needed to see "a more substantial commitment to self-help, particularly involving alcohol abuse" before it would consider granting parole. *Id.* at 47-48.

1    The Board went on to embroider this principal concern with worries about Gipson's
2 post-conviction plans. It noted that Gipson had "failed to upgrade educationally and
3 vocationally," *id.* at 66, and that his letters about parole plans for housing and work had not
4 been updated in three years. *Id.* at 26-31, 67. The state court concluded that these findings
5 constituted "'some evidence' to support the [Board's] conclusion that petitioner had
6 programmed in a limited manner and had failed to sufficiently participate in beneficial self-
7 help and therapy programs," and "had failed to obtain updated letters as to where he would
8 be staying and working if released." Dkt. #16, Exh. 2 at 5-6.

9    Under the "some evidence" requirement, the Board's denial of parole cannot be
10 justified based on Gipson's letters being somewhat outdated. *Lawrence* requires that "the
11 identified facts [be] *probative* to the central issue of *current* dangerousness when considered
12 in light of the full record." 190 P.3d at 560. Neither the Board nor the state court
13 articulated any connection between the date the letters were written and the current danger
14 Gipson poses to the community. Therefore it cannot constitute "some evidence" of future
15 dangerousness to deny Gipson parole.

16    However, Gipson's failure to commit to AA or a comparable alcohol treatment
17 program does constitute "some evidence" of his future dangerousness. The most recent
18 psychiatric evaluation identified alcohol as a "major risk factor" in Gipson's release and
19 based its estimate that his "risk of violence would be low" on active involvement in a
20 treatment program. Dkt. #1, Exh. N at 4. Countering that evaluation are the preceding
21 report's unqualified finding that Gipson "does not ... pose[] any threat to the public," *id.*,
22 Exh. M at 4, and Gipson's own observation that his cardiovascular system was in such a
23 state that he would be risking his health by drinking again. *Id.*, Exh. N at 51. But a
24 reviewing court must defer to the Board's "[r]esolution of any conflicts in the evidence" as
25 well "the weight" the Board gives the evidence. *Lawrence,* 190 P.3d at 548 (citing
26 *Rosenkrantz*, 59 P.3d at 204). While there was evidence pointing in the other direction,
27 there was certainly "some evidence" to support the Board's conclusion that Gipson's refusal
28 to commit to an active treatment program for his alcoholism made him a current danger to

- 13 -

the community. Thus the state court's denial of Gipson's petition was not "an 'unreasonable application' of the California 'some evidence' requirement." *Pearson*, 606 F.3d at 608 (quoting *Hayward*, 603 F.3d at 563).

In *Pirtle v. California Bd. of Prison Terms*, the Ninth Circuit found that the Board lacked "some evidence" for its denial of parole where the defendant's "history of alcoholism" and his failure to attend AA meetings were "the principal basis of its conclusion." No. CV-04-00518-FCD/KJM, 2010 WL 2732888, at *6 (9th Cir. July 12, 2010). However, *Pirtle* is different from this case, as Pirtle's reason for refusing to attend AA was that he was an atheist who did not believe in "a higher power." *Id*. at 2, 6. Pirtle was "willing to attend a secular substance abuse program," and had provided the Board with a list of such programs in the area he planned to live in which he planned to participate if released. *Id.* at 6. More importantly, the Board had not identified any "evidence that Pirtle will be unable or unwilling to manage his alcohol effectively upon release." *Id.* at 7. Conversely, Gipson's most recent psychiatric report specifically identified participation in a treatment program as critical to keeping his threat to the community "low," Dkt. #1, Exh. N at 4, yet Gipson told the Board he believed that "[m]eetings don't help you stop drinking." *Id.* at 48. Gipson never indicated a religion-based objection to AA participation, and never suggested that he would participate in any alternative active alcohol abuse program. So, while the court in *Pirtle* exposed a lack of evidence, this Court would have to discredit or balance the evidence that the Board did rely on to conclude that there was not "some evidence" of future dangerousness. Doing so is beyond the scope of "some evidence" review. *See Lawrence,* 190 P.3d at 548 (citing *Rosenkrantz*, 59 P.3d at 204).

**B. Board's Failure to Consider Use of Special Conditions**

Gipson argues that the Board failed to consider "the use of special conditions" under California's laws regarding determinations of parole suitability. Dkt. # 1, at 14 (citing Cal. Code of Regs., tit. 15 § 2402(b)). Specifically, he claims that the Board should have made "abstinence from alcohol" a condition for his release. *Id.* at 16. But § 2402(b) does not create a liberty interest for Gipson and other inmates up for parole;

1  rather, it simply creates a mandate that the Board must follow in making its
2  determinations. To create a liberty interest, a state statute must employ mandatory
3  language that creates an "expectation of parole." *Greenholtz v. Inmates of Nebraska*
4  *Penal Complex*, 442 U.S. 1, 11-12 (1979); *Bd. of Pardons v. Allen*, 482 U.S. 369, 373
5  (1987). While § 3041(b) creates a federally protected liberty interest by requiring that
6  the Board "shall set a release date unless . . . consideration of the public safety requires a
7  more lengthy period of incarceration," *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir.
8  2003); Cal. Penal Code § 3041(b) (West 2010), there is no such expectation created by
9  the language of § 2402(b).

10  Without a federally protected liberty interest, this Court cannot grant relief on the
11  basis of this claim. *Estelle*, 502 U.S. at 68; *Rivera v. Illinois*, 129 S. Ct. 1446, 1454
12  (2009); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does
13  not lie for errors of state law."). *But cf. Bd. of Pardons v. Allen*, 482 U.S. at 377-78
14  (holding that state statutes can create liberty interests in due process protected by the
15  federal Constitution); *Biggs*, 334 F.3d at 914; *Sass v. California Bd. of Prison Terms*,
16  461 F.3d 1123 (9th Cir. 2006).

### C. Board's Failure to Hold a Hearing Before Presumptive Release Date

18  Gipson argues that the Board's failure to conduct a hearing prior to his
19  presumptive release date violated his due process rights. Dkt. # 1, at 16. But the state
20  superior court determined that the statutory requirement for annual parole hearings was
21  directory rather than mandatory. Dkt. #16, Exh. 5. Because the statute does not "use[]
22  mandatory language ('shall') to 'creat[e] a presumption that parole release will be
23  granted,'" it does not give rise to a federally protected liberty interest. *Board of Pardons*
24  *v. Allen*, 482 U.S. 369, 378 (1987). Therefore any claim based on the California statute
25  is beyond the scope of this Court's review. *See Estelle*, 502 U.S. at 68; *Rivera*, 129 S.
26  Ct. at 1454 (2009).

### V. CONCLUSION

28  While there is evidence that Gipson is suitable for parole, this Court's review

must defer to the Board's "resolution of any conflicts in the evidence" and "the weight" the Board gives certain evidence in the record. *Lawrence*, 190 P.3d at 548 (citing *Rosenkrantz*, 59 P.3d at 204). The Board has certainly identified "some evidence" that Gipson remains a danger to the community and should not be paroled. In particular, the psychiatric evaluation that identified alcohol as "a major risk factor" for Gipson, Dkt. #1, Exh. N, 4, made his refusal to participate in AA or other institutional treatment programs highly problematic for his parole. Also, the fact he has "failed to profit from previous grants of probation," Dkt. #1, Exh. O at 45, gives the Board a basis to conclude that there is a risk Gipson will again fall into criminal activity if released. Thus, the Board did create the requisite "rational nexus," identifying evidence in the record to provide "the necessary basis for the ultimate decision–the determination of current dangerousness. *Lawrence*, 190 P.3d at 552.

**Accordingly,**

**IT IS HEREBY ORDERED** that Petitioner's petition for writ of habeas corpus (Dkt. #1) is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly.

DATED this 17th day of November, 2010.


/s/ Marsha S. Berzon

MARSHA S. BERZON
United States Circuit Judge, sitting by designation

- 16 -